1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 16-cr-00341-CMA

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**DAVID MICHAEL ANSBERRY,**

**Defendant.**

_____

**REPORTER'S TRANSCRIPT**
**(Resentencing Hearing)**

_____

         Proceedings before the HONORABLE CHRISTINE M. ARGUELLO, Judge, United States District Court, for the District of Colorado, commencing at 9:29 a.m. on the 17th day of March, 2022, Alfred A. Arraj United States Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
GREGORY ALLEN HOLLOWAY, U.S. Attorney's Office, 1801 California Street, Suite 1600, Denver, CO 80202
JENNIFER ELLEN LEVY, U.S. Department of Justice, 950 Pennsylvania Avenue, 950 Pennsylvania Avenue, N.W., Washington, DC 20530

**FOR THE DEFENDANT:**
COLETTE THERESE TVEDT, Colette Tvedt, LLC, 1660 Stout Street, Suite 1400, Denver, CO 80202

**MARCH 17, 2022**

(Proceedings commence at 9:29 a.m.)

THE COURT:  You may be seated.

The Court calls Criminal Case No. 16-cr-00341-CMA, encaptioned the United States of America v. David Michael Ansberry.

Counsel, would you please enter your appearances.

MR. HOLLOWAY:  Good morning, Your Honor, Greg Holloway, Assistant United States Attorney, on behalf of the United States of America.  Also on the line is Jennifer Levy of the National Security Division of the United States Department of Justice.

THE COURT:  Good afternoon -- good morning.

MS. TVEDT:  Good morning, Your Honor.

MR. HOLLOWAY:  It is almost afternoon at this rate.

THE COURT:  As long as we have been waiting.

MS. TVEDT:  Good morning, Your Honor, Colette Tvedt on behalf of Mr. Ansberry.  Seated to my left is Alex Walsh, who is an intern with my office, and we asked for permission for him to sit at counsel table.

THE COURT:  That's fine.

I'm frustrated because apparently they are having trouble getting Mr. Ansberry on by video.  They said -- they asked if they could do it by phone, and I said unless he waives his rights.  And I know that you had intended to

put on witnesses, but I will tell you that I feel badly because he has already served 5 years, 5 months, and 3 days.  And if I give him time served, who knows when we are going to be able to reschedule this hearing, and that is why I would like to proceed today.

MS. TVEDT:  Your Honor, I don't have permission from Mr. Ansberry to waive his appearance even via virtual court, Your Honor.

THE COURT:  You don't.  Then I can't proceed.

MS. TVEDT:  That's correct, Your Honor.  And I wanted to just make a record, and I think I have shared this with the Court in past pleadings, it has been incredibly difficult to communicate with Mr. Ansberry throughout the entire course while this case has been pending.

This is not a surprise to me, and it is frustrating because of the inability to discuss stuff.  We even got more pleadings from the United States Government, and I can't even talk to Mr. Ansberry about it.

So I just share with the Court that Mr. Ansberry is nonambulatory at this point.  We had requested the VTC so he could appear via video and to see the witnesses and to hear the arguments with his presence in the courtroom virtually.  So I just wanted to make that record, Your Honor.

THE COURT:  But if he has not consented to appear virtually, I can't even hold this hearing.

MS. TVEDT:  That's correct -- Your Honor, he had agreed to appear virtually on video.

THE COURT:  Okay.  Wait a minute.

MS. TVEDT:  No, Your Honor, we had filed that motion months ago.  Mr. Ansberry had a significant operation in December, and even before that, he was significantly ill.  So the travel would not have -- he may not have survived the travel.  But he wished to appear on video to see the witnesses and to hear the argument.

And, as I stated to the Court, we had gotten a new pleading yesterday and some other stuff on Friday, and I have not been able to speak with Mr. Ansberry.

But I would request that for his sentencing hearing -- resentencing, which I think will take more than an hour, Your Honor --

THE COURT:  I don't think so.  Once you hear what I have to say, I don't think it will.

MS. TVEDT:  Mr. Ansberry does want to appear, and I am not going to waive his presence.

THE COURT:  I don't believe that I am going to need any testimony.  I don't believe I am going to need any argument.  I have gone through the record, and I think the Tenth Circuit pretty much tied my hands.

MS. TVEDT:  Thank you.

THE COURT:  So, you know, we can wait.  I do have a 10 o'clock.  I hate to have Mr. Ansberry sitting in prison any longer.

MS. TVEDT:  Thank you, Your Honor.  If that's the Court's holding, Your Honor, then --

THE COURT:  Well, that's my inclination.  You know that I always tell you my inclination.  And I think after I tell you my inclination, you will realize that we don't really need to pursue it any further.

MS. TVEDT:  Okay.

THE COURT:  So if you want to talk to your client -- and I can hear argument from counsel, but I have read the briefing, I have read the original briefing, I have read the transcript, I read the Tenth Circuit's Opinion.  I have spent hours and hours, as you all have, and I don't understand why the Tenth Circuit didn't just remand it and say, "let him go."

I am pretty -- I just don't feel they should tie my hands that way unless they are just going to say -- I mean, why would you send it for remand?

MS. TVEDT:  I agree.  And I have spent similar time, Your Honor.

THE COURT:  I know.  All of us have, everybody.  All of the time that was spent on this, and they pretty

much just tied my hands.

So, if you want to talk -- see if you can get ahold of Mr. Ansberry.  But I cannot proceed if he is not agreeing to proceed by telephone.  And I am not sure they are ever going to get him on by video.

MS. TVEDT:  Under the circumstances, Your Honor, I would ask for the opportunity -- I have given Mr. Keech a contact to the legal counsel I have been working at Butner.  If she can make -- I am sure she can make allowances for me to have a phone conversation with Mr. Ansberry.  And I also have a cellphone, and I can step out.

THE COURT:  All right.  Well, we will be in a brief recess, and I will wait to see what we are able to do here.

MS. TVEDT:  Thank you.

(A break is taken from 9:37 a.m. to 10:04 a.m.)

THE COURT:  All right.  You may be seated.

We are back on the record in 16-cr-00341, United States of America v. David Michael Ansberry.

I understand that Mr. Ansberry is on the phone line; is that correct?

THE DEFENDANT:  Yes.

THE COURT:  Good morning, Mr. Ansberry.

THE DEFENDANT:  Good morning.

THE COURT:  Have you spoken to Ms. Tvedt about your right to appear before me in person?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  All right.  And you originally had agreed to waive that right and appear before me via VTC, but we are having video connection problems.  So I am assuming that you wish to proceed by telephone for this hearing; is that correct?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  All right.  And, Ms. Tvedt, you have spoken with him?

MS. TVEDT:  I have, Your Honor.

THE COURT:  All right.  The Court finds that the defendant has knowingly, voluntarily, and for good cause, after consultation with his attorney, waived his right to appear before this Court in person and has agreed to proceed to hearing on this matter via telephone.

The Court finds that this hearing cannot be further delayed without serious harm to the interests of justice, and as such, it is appropriate to proceed with this resentencing hearing by telephone conference with the defendant.

All right.  As you know, I always give you my inclination, and that is what I am going to do, because I think it will shortcut a lot of what everybody

anticipated.

On July 18, 2017, the defendant, David Ansberry, pleaded guilty, without a plea agreement, to the sole count alleged against him; use and attempted use of a weapon of mass destruction, in violation of 18 United States Code Section 2332(a)(2).  After two days of testimony, the Court sentenced Mr. Ansberry to a bottom-of-the-advisory-guideline sentence, as calculated, applying a number of enhancements.  That sentence was 324 months.

The defendant appealed, and the Tenth Circuit reversed this Court's application of two of those enhancements, finding that neither the official victim enhancement under United States Sentencing Guideline Section 3A1.2(a), nor the terrorism enhancement under United States Sentencing Guideline Section 3A1.4, was supported by the Court's findings.

The Tenth Circuit remanded the case to this Court for resentencing, and that is the purpose of today's hearing.

I have reviewed all of the documents that I reviewed for the initial sentencing.  In addition, I have carefully reviewed the Tenth Circuit's Opinion, I have reviewed the transcript of the testimony of the witnesses in the prior sentencing hearing, as well as my notes

related to that testimony.

I have also reviewed Document No. 145, the defendant's objections to the presentence report, which are really not objections to the presentence report, they are objections to the probation officer's recommendation that the Court vary upward.

I have also reviewed Document Nos. 60 and 166, the defendant's original sentencing memorandum and his supplemental resentencing brief, together with all of the exhibits thereto.

I have also reviewed Document Nos. 147 and 167, the Government's sentencing statement and supplemental resentencing statement.

The probation office recommends that the defendant be sentenced to 240 months' incarceration, followed by a 5-year term of supervised release.  The Government seeks a 324-month sentence of imprisonment.  The defendant seeks a sentence of time served.

And actually I need to go back because I failed to recognize Officer Ryan Kinsella, representing the United States Probation Office, is also in attendance at this hearing via VTC.  Good morning.

PROBATION OFFICER:  Good morning, Your Honor.

THE COURT:  All right.  At the original change of plea hearing, Mr. Ansberry admitted that he was pleading

guilty because he did the things charged in the Indictment.  He later narrowed down his conduct, however, and when I asked him, he said, "I plead guilty to attempting to detonate a destructive device in a deserted shopping center between 4:55 a.m. and 5:15 a.m. on October 11, 2016."

The Court gave the Government the opportunity to make a further record with respect to the factual basis. The Government supplemented by adding that the use of the telephone was "in or affecting interstate commerce."  That was the only supplement.

With respect to the official victim enhancement under Section 3A1.2(a), the Tenth Circuit found that the facts that had been presented show that there was "no doubt Mr. Ansberry pleaded guilty to violating Section 2332a(a)(2) based only on his attempt to use the device against property during that specific timeframe."  So they very much narrowly limited the conduct in this case.

The Tenth Circuit then went on to state, "We do not doubt that in some circumstances a Section 3A1.2(a) official-victim enhancement can apply when the offense of conviction is an offense against government property. But, under *Blackwell*, the enhancement does not apply (to an offense against property or to any other offense) unless the facts immediately related to the offense -- and

not any additional relevant conduct -- supports its application."

They found that my automatically treating an offense against government property as necessarily victimizing government employees conflicts with *Blackwell's* clear teaching.  And that is what they said this Court appeared to do in large part.

The Tenth Circuit found that this Court's finding that the fact that Mr. Ansberry left the bomb where "a police officer could pick it up," was an insufficient fact to demonstrate that the defendant's offense victimized government employees because this fact was outside the facts immediately related to Mr. Ansberry's property offense.

Rather, the Tenth Circuit found that this was "additional related conduct," which the Court inappropriately considered in contravention of the Tenth Circuit's holding in *United States v. Blackwell*, 323 F.3d 1256, Tenth Circuit, 2003.

The Tenth Circuit remanded the case back to this Court "so the District Court can consider in the first instance, whether the facts immediately related to the offense of conviction support the enhancement."

It is not clear to this Court why the Tenth Circuit remanded this case for further fact finding.  It had the

entire record that this Court had before it, and I assume the Tenth Circuit read it as carefully as this Court did.

Nonetheless, the Tenth Circuit remanded it, while tying this Court's hands, by finding that the facts "immediately related to the offense of conviction," in this case are limited to those the defendant included in his statement.  Because it limited this Court to such narrow confines, the Tenth Circuit could have just saved everyone a lot of time and money by just holding that the official victim enhancement does not apply.  This Court is inclined to find that the official victim enhancement does not apply.

Second, with respect to the terrorism enhancement, the Tenth Circuit held that "if the sentencing court applies a Section 3A1.4 terrorism enhancement on the ground that the defendant's offense was calculated to retaliate against government conduct, the conduct that the defendant retaliates against must objectively be government conduct."  Apparently the defendant's subjective intent plays no role whatsoever in this analysis.

Section 3A1.4(a) of the United States Sentencing Guideline provides that "if the offense in a felony that involved or was intended to promote a federal crime of terrorism," the base offense level should be increased by

12 levels.  And if the resulting offense level is less than level 32, the base offense level should be increased to level 32.  Section 3A1.4(b) adds that the defendant's criminal history category should be a Category VI.

The application note to Section 3A1.4 states that for purposes of that guideline, "federal crime of terrorism," has the meaning given that term in 18 United States Code Section 2332b(g)(5).  That section defines a "federal crime of terrorism" as "an offense that:  (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.  (B) is a violation of certain enumerated statutes."

In the initial sentencing hearing, the Court, after a lengthy analysis of the case law in this and other jurisdictions, concluded that the 12-level upward adjustment to the base offense level provided by Section 3A1.4(a), especially in light of the accompanying increase in criminal history category from a I in this case to a VI, that was required by Section 3A1.4(b), was an extraordinary upward adjustment that justified the use of a more demanding standard of clear and convincing proof that the defendant's conduct satisfies the requirements of Section 3A1.4.  This Court stands by that decision.

After two days of listening to testimony of those

impacted by Mr. Ansberry's crime, this Court found that Mr. Ansberry's crime was calculated to "retaliate against government conduct."  The conduct that Mr. Ansberry was retaliating against we he planted his device outside of the offices of the City of Nederland's police station, was Nederland Town Marshal Renner Forbes' killing of Mr. Ansberry's friend Guy Goughnor, also known as Deputy Dawg.

Although Marshal Forbes was the primary suspect in the killing of Mr. Goughnor, there was insufficient evidence to link him to the killing.  More than 25 years later, however, Marshal Forbes admitted and confessed to killing Mr. Goughnor, and he pled guilty to manslaughter.

The Court found that there was clear and convincing evidence establishing that the reason defendant researched and created an IED bomb, disguised the bomb by placing it in a duffle bag, then placed the bomb in the immediate vicinity of the Nederland Police Department, was in order to specifically target the Nederland Police Department and its individual employees because he wished to retaliate against the police for the long-time grievance he apparently had based on the 1971 murder of his friend, Guy Goughnor, by then Town Marshal Renner Forbes.

Defendant's placement of the explosive device proximate to the Nederland Police Department, the STP

sticker, and writing about Deputy Dawg, stuck to a window next to the department's storefront on the day of the incident, defendant's journal entries, and conversation with Ms. Bozik, established, at least in this Court's mind, that the defendant carefully calculated retaliation against what he perceived to be government conduct.

However, the Tenth Circuit has said that it does not matter what the defendant's subjective intent was; in other words, that in his mind he was retaliating against what he believed to be government conduct, did not matter.

Based on the Tenth Circuit's holding, however, in order to find that United States Sentencing Guideline Section 3A1.4 applies in this case, this Court would be required to find that in July of 1971, when Renner Forbes killed Mr. Goughnor, he did so in his official capacity as Marshal of Nederland.

No trial was ever held.  No facts were ever developed relating to Mr. Forbes' crime, or if they were, they were not brought to the attention of this Court. Mr. Goughnor was killed on July 17, 1971.  This Judge had just turned 16 years old at the time.  It has now been more than 50 years since Mr. Goughnor was killed.  There is no way that this Court could make any findings, and specifically could not make a finding that when Marshal Forbes killed Mr. Goughnor, he did so in his official

capacity as Marshal of Nederland.  It appears to this Court to have been the action of a rogue law enforcement officer, not the actions of the government office of the marshal.

The Government urges this Court to use the first clause of Section 2332b(g)(5) to apply the enhancements provided by Section 3A1.4(a) of the United States Sentencing Guidelines.  At the original sentencing hearing, this Court specifically did not apply that first clause of 2332b(g)(5) because it did not believe that there was evidence to support a finding that Mr. Ansberry's crime was "calculated to influence or affect the conduct of government by intimidation or coercion."

Mr. Ansberry admitted that he planted the bomb to remind everyone that his friend had been killed.  His planting of the bomb at the police station was misguided, but there is no evidence that he thought the bomb would influence or how it would affect the police department's conduct of its business in the future.

Nothing has changed, and the Court stands by that decision, as well.  The Court is inclined to find that the terrorism enhancement of United States Sentencing Guideline Section 3A1.4 is not applicable.

This would result in the total offense level being

21.   The defendant's Criminal History Category is a I. That results in an imprisonment range of 37 to 46 months and a fine range of $15,000 to $150,000.  The supervised release range is 2 to 5 years.

As of today, the defendant has served 5 years, 5 months, and 3 days.  That is well beyond the advisory guideline range.  The Court is still of the opinion that the fact that Mr. Ansberry's IED bomb did not detonate was entirely fortuitous.  The fact that fortuitously no one was injured and extensive damage did not result does not in any way mitigate the defendant's culpability.  But this Court also does not think that the actions should be considered aggravating factors.

I am inclined to find that there is no basis to upward depart, and since Mr. Ansberry has already served more time than recommended in the advisory guideline range, I am inclined to sentence him to time-served.

With that being said, Ms. Tvedt, I will hear any further argument you wish to make.  Then I will hear from Mr. Holloway.  And, finally, Mr. Ansberry, if you wish to make a statement, I will hear from you.

MS. TVEDT:  Your Honor, I have nothing to add to the Court's decision.  I agree with what the Court has found here in Court.  I have also filed similar briefings, Your Honor, and I accept the Court's findings.

THE COURT:  All right.  Mr. Holloway?

MR. HOLLOWAY:  Yes, Your Honor.  If I may make a record, I will proceed backwards.

I do believe that the Court reads Mr. Ansberry's retaliation and his motive for it too narrowly.  I think relying solely upon his revenge being based on Renner Forbes' murder of Guy Goughnor is erroneous, in that the defendant was clear in the record, in his writings, and in what it is that he said in his allocution, about his grievance being not only the murder of Guy Goughnor, but law enforcement's failure to bring Renner Forbes to justice, the failure to prosecute him in what the defendant believed was a timely manner, and the resultant sentence of that eventual conviction of Renner Forbes for manslaughter.

So I believe that I respectfully disagree with the Court limiting this solely to Renner Forbes' murder of Guy Goughnor.  I believe it encompasses more behavior than that.  And the Government has filed cases which indicate that the Court can consider those other factors, as well, in making its determination for motive of retaliation.

I would point the Court's attention to the recent Tenth Circuit decision in *United States v. Varnell*, that is at 2021WL5875718.  It is a Tenth Circuit Opinion narrowing the Circuit's previous ruling in Ansberry solely

to the retaliation prong.

I understand the Court's instruction on that and the Court's explanation that the Court will not rely on the other prong of the terrorism enhancement.  The Government maintains that both prongs apply.

I will also say, and I am reticent to do so because we do not want to see a "murder" as official conduct, but it is something I feel compelled to argue about given the filing of the defense.  And I will point the Court's attention to Defense Exhibit B, at page 358.  That is found in the ECF Document No. 166, at page 80.  It is the press release from the Boulder County Sheriff's Office related to Renner Forbes' murder of Guy Goughnor, and it specifically states in that evidence that "the murder took place while Mr. Forbes was on duty as the Nederland Town Marshal."

I do believe that the evidence shows that Renner Forbes picked up Guy Goughnor at the Pioneer Inn in his duty and on his job as the town marshal.  He was called to the Pioneer Inn, he took custody of Guy Goughnor in his patrol car, and I believe that the evidence supports the difficult finding that the murder unfolded while Renner Forbes was acting in his official capacity.

I would submit to the Court, as distasteful as that is to ponder, there are incidents where law enforcement

officers, in the course of carrying out what they believe their official duties are, they go too far and they commit crimes. There are examples, sad examples of that in recent history.

There are police officers in Loveland who are now charged with assaulting a woman in the course of arresting her. There are police officers now who have been convicted of murder or of manslaughter in the course of executing their duties arresting people. And, again, while it is painful to point out those things, it is a difficult truth.

The facts submitted by the defense in their recent filing point to that notion; that Renner Forbes was acting in his capacity as the town marshal. The reports bear that out. His logs bear that out. He responded to an accident after the murder. He picked up Guy Goughnor in his patrol car. Law enforcement searched his log books, they searched his patrol car.

And, again, what strikes me is the Boulder County Sheriff's Office press release, as submitted by the defense, as I have cited, where it point blank says, "the murder took place while Mr. Forbes was on duty." And the Court is right that we are talking about a crime that occurred when the Court was 16 years old and I had yet to be born.

But, in looking at that evidence, again, in evaluating where it is that we are at today, and in evaluating what it is that happens, while, again, I am reticent to point that out, I think that the facts support a finding that even if the Court were to narrow this to only the murder committed by Renner Forbes, it is objectively government conduct, it is, because the press release says it is and because the facts say it is.  He used his patrol car, he committed the murder after he detained Guy Goughnor, and he went back on about his duties as town marshal.

The evidence in Defense Exhibit B also show that Forbes talked about making the killing look like a "good shoot."  Again, that implies that Renner Forbes was acting in his official capacity.  And I must emphasize that while that is a difficult concept to wrap our minds around, it is, indeed, something that is borne out by the evidence here.

And, again, there are cases now that have been brought to light that are very prominent where police officers do act in their official capacity and that results in criminal behavior sometimes.  And, in fact, it underscores the argument that the terrorism enhancement applies and that that is the very behavior that David Ansberry takes issue with.  That is the very behavior and

22

governmental conduct he sought to affect by committing this crime.

And so I think if you look at the facts of the case and the record in this case, there are sufficient facts to find that this retaliation is not solely for the murder committed by Mr. Forbes, it is retaliation for his lack of prosecution immediately and the subsequent prosecution and the subsequent official conduct, but also I think that there are facts that do support -- sadly support -- that the murder of Guy Goughnor happened, again, while Mr. Forbes was on duty as the Nederland Town Marshal.

So that is the argument that the Government would say supports the finding of the terrorism enhancement in this case.

Furthermore, with regard to official victims, it is supported by the record in this case, by facts immediately related to the offense, in that the defendant didn't remove this bomb.  That the defendant placed this bomb at the sign for police parking, while the record is replete with evidence about how lost and found items are left there.  And I think that, again, the Court reads the Tenth Circuit Opinion too narrowly.

And I believe that there are facts justifying the application of the official victim enhancement, as well, as defined in *United States v. Drapeau*, that is at 188

F.3d 987, it is an Eighth Circuit case from 1999, with a similar fact pattern here, where the defendant sought to destroy police property, but the resultant trauma to the police officer victim led to the application enhancement that was permissible.  And that goes hand in hand with the Tenth Circuit case of *United States v. Smith*, which is found at 133 F.3d 737, a 1997 case from the Tenth Circuit, that talks about how when victims are traumatized emotionally and suffer PTSD, that is sufficient for application of a victim enhancement.  And clearly Officer O'Naullain demonstrated that to the Court firsthand when you heard his testimony.

So I would urge the Court not to read the official victim enhancement quite as narrowly either.

THE COURT:  Well, I don't think I have a choice.  They essentially limited me to that time frame, to a property offense.  I did find that he left it where a police officer would pick it up, and that wasn't enough.  They essentially said I cannot look to what happened later, I am stuck with what he pled guilty to.  And, I will say, it was good lawyering on the part of his lawyer.

But I do think that they totally tied my hands with that.  So I understand your argument, but I think if I am to look at the 4:55 to 5:15 a.m., there is nothing else I can see on the record to support it.

MR. HOLLOWAY:  Then, lastly, Your Honor, I will point out the 3553(a) factors again.  It is inconceivable that this defendant would choose a mechanism that was as indiscriminate as this one, as dangerous as this one.  And the preparation and the careful assembly and construction of this device is an abhorrence.  And I would urge the Court to depart upward and vary upward under the 3553(a) factors.

As I noted at the initial sentencing, there was a lot of initial evidence about the struggles the defendant has in terms of his disabilities.  And what is unconscionable to me is that here is a person who understands the difficulties of that, and yet he would choose to do something that would essentially imprison other innocent people to the same fate.

And so given what it is that he set in motion here, it begs for an upward variance under 3553(a).  David Ansberry knows that Renner Forbes is long dead.  He knows that.  That is why restricting the analysis solely to revenge for the murder of Guy Goughnor is a legal fiction.  He planted this bomb in retaliation for law enforcement -- of his hatred for law enforcement.  Now, is Renner Forbes a part of that?  Yeah, he probably is.  But it's larger than that.  And the Circuit allows this Court to make findings that are larger than that.

And so, again, it shows a depravity, it shows an abhorrence, it shows an indiscriminate willingness to lash out and hurt people that have nothing to do with what it is that Renner Forbes did before I was born and when Your Honor was still in high school.  It demonstrates fallacy of the defendant's argument here.

I would implore the Court, again, to apply the terrorism enhancement in weighing all of the facts.  And all of the facts show it is in retaliation for objective government conduct.  I would now argue with the new evidence, as submitted by the defense in their last filing, that as distasteful as it is to argue, that Renner Forbes murdered Guy Goughnor while he was on duty as the Nederland Town Marshal.

I would implore the Court to look at the factors under 3553(a) and vary upward given what it is that this defendant specifically did, the effort he went to, the care he took, the type of material he synthesized -- the volatile material he synthesized to commit this offense.

This wasn't merely designed to be a prank to draw attention to some 40-year-old murder, it was designed to inflict damage and destruction on the Nederland Police Department, on the Town of Nederland, and in retaliation for official government conduct that spans decades in his mind.

So, unless the Court has any further inquiry of me, I am done.

THE COURT:  I do not, Mr. Holloway.  Thank you very much.

Mr. Ansberry, do you wish to make any statement to me on your own behalf before I impose sentence?

THE DEFENDANT:  No, I don't, ma'am.

THE COURT:  All right.  As a result of the United States Supreme Court's rulings in *United States v. Booker* and *United States v. Fanfan*, the United States Sentencing Commission Guidelines have become advisory to this Court. Although this is not bound to apply those guidelines, it has consulted them and taken them into account along with the factors identified at 18 United States Code Section 3553(a).

Based on the Tenth Circuit's Opinion reversing this Court, the Court finds that the 3-level victim-related adjustment pursuant to United States Sentencing Guideline Section 3A1.2(a) does not apply.  The Court finds that the 12-level victim-related adjustment pursuant to United States Sentencing Guideline 3A1.4(a) does not apply.

The Court finds that the total offense level is 21. The defendant's Criminal History Category is a I.  That results in an imprisonment range of 37 to 46 months and a fine range of $15,000 to $150,000.  The supervised release

range is 2 to 5 years.

The Court finds no reason to depart or vary upward from the guideline range, which does not exceed 24 months. Pursuant to the Sentencing Reform Act of 1984, it is the Judgment of the Court that the defendant, David Michael Ansberry, is hereby sentenced to time served.

Upon release from imprisonment, he shall be placed on supervised release for a term of 5 years.  Within 72 hours of release from the custody of the Bureau of Prisons, he shall report in person to the probation office in the district to which he is released.

While on supervised release, he shall not commit another federal, state, or local crime; shall not possess a firearm, as defined in 18 United States Code Section 921; and shall comply with the standard conditions that have been adopted by this Court.

He shall not unlawfully possess a controlled substance.  He shall refrain from any unlawful use of a controlled substance.  He shall submit to one drug test within 15 days of release on supervised release and a maximum of 20 tests per year of supervision thereafter. He shall cooperate in the collection of DNA as directed by the probation officer.

The Court finds that the following special conditions of supervision are reasonably related to the

factors set forth at 18 United States Code Section 3553(a) and 3583(d).  Further, based on the nature and circumstances of the offense and the history and characteristics of this particular defendant, these conditions do not constitute a greater deprivation of liberty than reasonably necessary to accomplish the goals of sentencing.

One, the defendant shall participate in and successfully complete a program of testing and/or treatment for substance abuse as approved by the probation officer until such time as he is released from the program by the probation officer.

He shall abstain from the use of alcohol or other intoxicants during the course of treatment and shall pay the cost of treatment as directed by the probation officer.

Second, he must participate in a cognitive behavioral treatment program as directed by the probation officer until such time as he is released from the program by the probation officer.  He must pay the cost of treatment as directed by the probation officer.

Third, he shall submit his person, property, house residence, papers, computers, other electronic communications or data storage devices or media or office to a search conducted by a United States Probation

Officer.  Failure to submit to search may be grounds for revocation of release.

He shall warn any other occupants that the premises may be subject to searches pursuant to this condition.  An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and the areas to be search contain evidence of this violation.  Any search must be conducted at a reasonable time and in a reasonable manner.

Although the provision of the *Mandatory Victim Restitution Act* of 1996 apply to this Title 18 offense, the Court finds there is no restitution to be ordered. The probation office has indicated that Mr. Ansberry has already paid in full the $100 special assessment.  The Court continues to find that he does not have the ability to pay a fine, so the Court waives the fine in this case.

Mr. Ansberry, you are advised that you have the right to appeal this sentence.  If you desire to appeal, a Notice of Appeal must be filed with the Clerk of the Court within 14 days after entry of Judgment or your right to appeal will be lost.

If you are not able to afford an attorney for an appeal, one will be appointed to represent you.  And, if you request, the Clerk of the Court must immediately

prepare and file a Notice of Appeal on your behalf.

Is there any other business to be brought to my attention?

MS. TVEDT:  No, Your Honor.  He is going to be released in North Carolina, so I think that he ultimately will be returning home to California, but we can address that with probation, Your Honor.

THE COURT:  All right.  Anything, Mr. Holloway?

MR. HOLLOWAY:  No, Your Honor.  Thank you.

THE COURT:  All right.  Mr. Ansberry, best of luck to you.  I hereby remand to the custody of the Bureau of Prisons for processing and release.

THE DEFENDANT:  Thank you, ma'am.

MS. TVEDT:  May I speak to him, Your Honor?

THE COURT:  You may.

MS. TVEDT:  Mr. Ansberry, can you please have your case worker call my cellphone so we can continue talking.

THE COURT:  All right.  Court will be in recess.

MS. TVEDT:  Thank you, Your Honor.

(Proceedings conclude at 10:40 a.m.)

# R E P O R T E R ' S   C E R T I F I C A T E

I, Darlene M. Martinez, Official Certified Shorthand Reporter for the United States District Court, District of Colorado, do hereby certify that the foregoing is a true and accurate transcript of the proceedings had as taken stenographically by me at the time and place aforementioned.


Dated this 28th day of March, 2022.


_____
s/Darlene M. Martinez
RMR, CRR

DARLENE M. MARTINEZ, RMR, CRR
United States District Court
For the District of Colorado